**Opinion issued July 7, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00457-CR

———————————

**CHARLES BRANDON CASE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1377988**

---

## MEMORANDUM OPINION

This is an appeal from a murder conviction.  We affirm.

# TRIAL PROCEEDINGS

## A.    State's case

Deputy T. Wright with the Harris County Sheriff's Office testified that he was one of two officers dispatched to a family disturbance at an apartment on West Road on February 18, 2013, about 5:30 or 6:00 in the evening. Deputy O'Neil, who was already on the scene, reported to Wright that he had just sent a stabbing victim to the hospital, and that he had a suspect in the apartment.

Wright testified that the apartment was in disarray, with a large amount of blood on the floor. Appellant was sitting on the floor in boxer shorts with blood on his legs and hands. Appellant was "somewhat excited, like he was, like, breathing heavily sweating a little bit, like he'd just had a – someone who just had a physical altercation."

Wright asked appellant what had happened, and appellant responded "I stabbed her in self-defense after she stabbed me." Wright asked, "Well, where are your injuries? Where did you get stabbed?" Appellant "pointed to the inside of his forearm." Wright testified that, from "about 5 to 10 feet [away], somewhere in that distance, [he] saw a little mark on the inside of [appellant's] forearm, which isn't really consistent with being stabbed in a self-defense manner from what I'm used to."

2

Appellant then began complaining of chest pains, and Wright called an ambulance for him. Paramedics assessed appellant and determined he did not need any treatment. Wright's opinion was that all the blood on appellant was the complainant's, not appellant's, because appellant "had no injuries to sustain the amount of blood that was inside the apartment and on his arms."

N. Blue, an EMT with the Cy Fair Fire Department, testified that he and a partner were the first ones dispatched to appellant's apartment. They found the complainant lying on the floor in the doorway of the apartment, covered in blood, with appellant leaning over her holding a cloth up to her neck. Blue explained that, normally, if members of his department walked into what has obviously been the scene of a violent crime, they would retreat until police officers arrived. In light of the complainant's condition, however, they assessed and began treating her. While they were doing so, appellant told them that they got in an argument and that he stabbed her in the neck. Appellant made no mention of having stabbed her in self-defense. At one point, he did say, "she went crazy this time." Blue described the apartment as clean, but in a complete state of disarray.

Blue testified that appellant appeared concerned that he had seriously injured the complainant, but he was not distraught or crying. The EMTs did not assess or treat appellant because the complainant was in serious condition and would die if not immediately treated. He further opined that the type of blood loss she

3

experienced would be the result of a punctured artery and multiple stab wounds. The complainant was unconscious and unresponsive, taking "agonal respirations" i.e., those breaths that are slow and long, meaning that she is not able to bring in enough air into the body to sustain oxygen to the brain and to the vital organs." In response to being asked to describe the complainant's injuries, Blue explained what they observed:

> She had — well, she had a towel or shirt wrapped around her neck. So we saw a large amount of blood coming from her neck, the left side of her neck. Once we exposed that area, she had a large gash and several punctures on the left side of the neck . . . . Well, when you have a carotid artery that supplies blood to the brain, from the heart to the brain, and you have your jugular vein, if those are cut, what we call bleeding out, because your body is pipes, pipes and containers, right? . . . She had — she had wounds to her torso, her abdomen, and her back. . . . I think there were — we counted six wounds, we did, and then the hospital counted a couple more.

Despite all their attempts at stopping the complainant's excessive bleeding and rushing her to the hospital, Blue testified that she died from her injuries shortly after arriving at the hospital.

Blue has experience responding to domestic disputes, but he did not observe any defensive wounds on the complainant's body.

J. Roberts, another Cy Fair EMT, testified that he and a partner were dispatched to the apartment in an ambulance to examine appellant, who had complained of a headache and chest pains. Following a head-to-toe examination, they reached the conclusion that appellant was okay, but offered to transport him to

4

the hospital for more tests. Appellant declined. Robert's examination revealed an abrasion on appellant's forearm. No other injuries were apparent, although Roberts testified that bruises can take time to appear after a trauma. Appellant was covered in much more dried blood than the abrasion on his forearm could have caused. Roberts observed no injuries on appellant's hands. Initially, appellant's heart rate was elevated, as is expected when someone is upset, but it had gone back down by the time Roberts left. Roberts described appellant as coherent and sober, and noted that appellant stated he only had one sip of the complainant's alcoholic drink earlier.

Deputy C. Reece, with the Harris County Sheriff's Office, testified that he was the crime scene investigator supervisor at the scene. He described for the jury the items from the apartment shown in pictures admitted as State's exhibits. The pictures reflected the apartment in disarray, with debris scattered, a desk chair turned over, and a broken aquarium. There was a vacuum cleaner lacking blood transfer or splatter laying in a pool of dried blood, which indicated to Reece that the bleeder laid in place for a while before the vacuum fell there.

Because the dispatch call indicated a stabbing had taken place, Reece set about identifying any sharp objects that could have been the weapon, examined them for blood, and dusted them for fingerprints to determine who handled them. He collected a hammer, two sets of needle-nose pliers, and three knives.

Because appellate claimed to have suffered injuries, Reece also photographed him as documentation. Appellant did have scratches on his arms, but Reece explained why they were not consistent with typical defensive wounds. If they were defensive wounds, Reece opined that they were "very minor." Appellant also had some scratches on his face. He also had significant amounts of blood splatter and transfer on his body that were not from his own scratches. Finally, Reece testified that appellant did show evidence of recent bruising on various parts of his body.

After Reece finished processing the apartment, he went to the hospital to examine the complainant's body and document her wounds, which he described and compared with appellant's with the following testimony:

> [Reece]:    That's her right hand. A couple of photos that — on the gentleman of his hands. I took them — we always take them to show any defensive wounds or any kind of cuts or scrapes on either side of the hands. And that's basically what I'm doing. She's deceased, so somebody is holding her hand open, but you can see a cut right here, which is indicative of a defensive wound when they're trying to grab a blade coming at them or even this direction (indicating), depending on how the assailant is holding it, with the sharp edge one way or the other.
>
> . . . .
>
> A    That's her left hand, same thing. Definitive wound right here as if you're trying to grab the knife.
>
> Q.    How is State's Exhibit 24 different than the injuries that we saw on the defendant?
>
> A.    Well, the picture — I took photographs of the inside of his hands, and he has none on his hands.

Q.   He has no defensive wounds?

A.   No.

. . . .

That's her, I think — yeah, that's her left shoulder. This is — I started documenting the bruising on her first, which is here (indicating).

Q.   And is that consistent with a handprint or pressure being applied?

A.   It's — yeah, that's what bruise — causes a bruise, yes, on him and her.

. . . .

A.   That's her right arm. Again, just showing bruising first.

Q.   And Officer, do these appear to be consistent with fingerprint pattern, pressure being applied by a hand?

A.   They could be. I can't say for sure.

. . . .

A.   That's the back side of her hand. Like I said, I'm documenting the body on both sides, the outside of the hands and the inside of the hands. That was the one that -- the outside of the hand just prior to taking the other one that shows the defensive wound inside. And her hands that had paper bags on them and taped here, which then they were replaced so that the -- the autopsy, they can collect fingernail scrapings.

. . . .

Q.   And what's significant [on her legs]?

A.   And bruising, bruising around the knees inside of the calves.

. . . .

A.   That's the lady's — the complainant's abdomen.

Q.   And how many wounds are we looking at here?

A.   I didn't count them because of the fact that, before this person was deceased, when they're cleaned up and autopsied, then

7

they can get an accurate count. There were numerous, as you can see in the photographs.

. . . .

Q. What are we looking at in State's Exhibit No. 90?

A. It's a slicing type of evisceration wound. It's on the left-hand side towards the back. There's two of them.

Q. And Officer, what are we looking at in State's Exhibit No. 23?

A. This is her rolled onto her right side with multiple stab wounds to the back.

Q. And, Officer, is it fair to say that the photos I'm showing are not all the injuries that you photographed that day, these are just some?

A. Correct.

. . . .

Q. And, Officer, the injuries that we just saw, are those consistent with a stab wound?

A. Yes.

Q. Are these wounds serious bodily injury?

A. She's dead, yes.

. . . .

Q. Officer, based on your training and experience, how much force would be required to create the injuries that we observed on the defendant[?].

A. The size and the depthness of it as far as kinetic injury, I can't — I'm not an expert witness in that. All I can say is they were shallow scratches.

Q. And what is — what can you tell us about the significance of the injuries that we observed [on the complainant]?

A. Even though I'm not a medical examiner, from those that I took, they are deep wounds. That's all I can say.

Q. Okay. Would you describe these injuries as comparable?

A. No. One is quite deep and one is quite superficial.

8

Q. What was the difference in the number of wounds to the victim and the scratches to the defendant, if you know?

A. Just from my viewing and not adding hearsay, there were multiple deep wounds on the victim and relatively few — I tried to point all of them out on the defendant.

Q. Was it greatly disparate?

. . . .

A. Yes.

On cross examination, Reece testified there were two adult beverage cans in the kitchen sink, and the bottom of a broken highball glass. He was unable to lift fingerprints off either one. In fact, he was not able to develop any identifiable fingerprints in the apartment.

Sergeant C. Clopton with the Harris County Sheriff's Office, a homicide investigator, testified that—when he arrived at the scene—he canvassed for witnesses to the altercation, but was unable to locate any. He described the apartment as the violent scene with much blood everywhere.

He then returned to his office, watched the initial interview of appellant, and then interviewed appellant himself. Clopton was surprised by appellant's demeanor, as he did not appear upset. Clopton observed some scratches on appellant, but no stab wounds. In his opinion, the scratches were not defensive in nature:

[Clopton]: Looking at the scratches that were on the forearms of the defendant, specifically one scratch that went almost completely around the arm, could not be — could not have been obtained from a

9

defensive posturing, that the force of a knife or a object, sharp object, swinging would not continue around the forearm.

Q. And why is that significant?

A. Because that shows that that's not a defensive injury, which it was claimed to be.

Q. And what about the significance of her wounds?

A. Her wounds were definitely indicative of stab wounds and slash wounds.

Q. Was there anything — do you recall in the evidence that you observed — any defensive wounds that you observed on the victim?

A. Yes, I did.

Q. Where were those defensive wounds?

A. In the hands and the webbing of the — between the thumb and the forefinger and on the inside of the fingers.

Q. And why would you characterize those as defensive wounds?

A. Well, when you're defending yourself, it's typically what you would put up as a shield or as a blocking mechanism to ward off whatever object is coming toward you. You typically put up your hands or your forearms and — or even a motion to try to grab the object to get it away from the stabbing your inner body, you then receive injuries to your hand.

. . . .

Q. Knowing that the defendant was claiming self-defense, what was the significance of the wounds to her back?

THE WITNESS: They were — they were inconsistent of his description of how they — they would have occurred. The injuries in the back would have had to have been done from — from the back.

. . . .

Q. Do you know, based on your observations, whether or not the victim was on the ground at some point?

A. Yes.

10

Q. Did you observe any blood on the defendant that indicated he may have been next to the victim or on the victim?

A There was blood on the defendant. I mean, I can say he had to have been in close proximity to her at some point, yes.

Q. What is it about her stab wounds, and you mentioned that she had been weakened and incapacitated, that stand out to you when someone's claiming self-defense?

. . . .

A. That there were so many wounds that the aggressor — had the deceased been the aggressor would have given up, if she had been the aggressor, long before she received that many stab wounds.

Clopton also testified about the 911 call appellant made in which the complainant can be heard screaming to be let go. He opined that is inconsistent with the complainant being the aggressor.

Elizabeth Gilbert, the complainant's mother, also testified. She explained that the appellant and complainant were in a relationship and lived together. The complainant had six children and was on social security disability because she had twice fractured her hip, which caused her pain. She also took medication for ADHD and depression.

Deputy J. Perez with the Harris County Sheriff's Office testified that he responded to an earlier domestic assault call made by the complainant on January 20, 2013. When he pulled into the complainant's apartment complex on that day, Perez saw the complainant on the phone in the parking lot waving him down. She was very upset and crying while she tried to talk to Perez. Perez noticed light bruising on her arms as she pointed repeatedly up to her apartment, saying "he"

11

was still inside. Ultimately, the complainant was embarrassed and refused medical assistance.

Perez went up to the complainant's apartment, where he found the door open, and some items broken on the floor. There was a hole in the bedroom door, and the bathroom sink had been pushed down so hard it was damaged. Perez found appellant in the complainant's apartment and talked to him briefly before other officers escorted appellant out. Perez described appellant as calm and evasive. He did not see any physical injuries on appellant. Appellant told Perez that the complainant was insecure because appellant was younger than her, and he denied hitting her. Appellant said the argument that day was also about the complainant not timely taking her medication.

Appellant also told Perez that this was not the first time the police had been called to their apartment, but that the police usually just made him leave each time. Perez said that both appellant and the complainant had been the callers on previous occasions. Appellant told Perez that they always got back together after the police leave. Perez said the district attorney's office declined to accept charges, but that the case was nonetheless turned over to the Sheriff's Department's assault investigation division for follow-up.

Deputy S. Mills with the Harris County Sheriff's Department, domestic violence division, next testified. She was referred the complainant's case in January, 2013, but closed it because the complainant was not willing to prosecute.

Finally, Dr. A. Lopez, an assistant medical examiner testified about the complainant's injuries and autopsy. The autopsy revealed "multiple sharp-force injuries and then multiple blunt-force injuries" in detail. The complainant had been stabbed a total of thirty times, puncturing several major organs (including her lungs and liver) and her jugular vein. From the front, where she suffered sixteen of the stab wounds, she was also stabbed in the jaw multiple times, the breast, the abdomen, diaphragm, and peritoneum. The rest were on her back, which included three stab wounds that punctured her right lung, diaphragm, and liver, and another cluster of six stab sounds in the middle of her back that caused additional significant blood loss. Her toxicocology screen reflected a blood-alcohol level of .04.

The State rested, and appellant's motion for directed verdict was denied.

**B. Appellant's case**

R. Ethridge, appellant's brother, testified that appellant's mother and step-father lived in the same apartment complex as the complainant, and that was how the appellant and complainant met. He also testified appellant and the complainant had lived together for about a year before her death.

Appellant testified that he met the complainant around his apartment complex, and that they began dating about three months after meeting, and then he moved into her apartment about three months later. He testified that sometimes during the time they lived together, he would stay at his grandmother's house (that was closer to his office) if he "either worked late at work or got off — got off late or had to get up early or [the complainant] had been drinking."

After appellant moved in, he learned about some of her medical issues. Appellant would drive her to her doctors' appointments and to pick up her prescriptions, and said she was on many medications. He also testified that the prescription medications she took affected her and her behavior while they lived together.

According to appellant, recently before the complainant's death, she had been to the doctor and received a new prescription medication that changed her behavior, describing it as "very, very angry behavior. Very lopsided, up and down." Appellant testified that when the complainant would take "the medication, her behavior would become very erratic. She would be very up one second and happy, you know, talkative, interactive, very sweet, and then she would change sometimes. She would be very — very down and depressed." He said these changes would occur within 15 to 30 minutes of her taking her medication.

When specifically asked about the day before the complainant died, he testified that she was very depressed and upset about her daughter getting kicked out of her grandparent's house and her brother's recent overdose and suicide. According to appellant, the complainant acted very strangely all evening. She was going back and forth between the bathroom and kitchen, and "[s]he would cry and be depressed and kind of scream and bang on the walls." He tried to go to sleep, but woke up throughout the night as she paced and banged on walls.

On February 18, the day he killed the complainant, appellant said the day started fairly routinely; he made some breakfast and she took her medications. They ran errands, got some lunch, and then stopped by the pharmacy, finally arriving back at the apartment about 1:00 in the afternoon. Appellant said the complainant was sad and depressed the entire time they were out.

Appellant got on his computer to do some work and chat with friends, while the complainant continued to behave erratically, pacing back and forth and making herself an alcoholic drink. He described her as very standoffish, and claimed that when he would try and interact or engage with her, and she "say a few words and just kind of go back about her business."

Appellant claimed he had not been drinking that day, other than taking a sip of one of the complainant's drinks because she asked him to. He estimated she had 4 drinks between that day and the previous night. He estimated that she had at

least ten different medications that were prescribed to her, and said that her behavior changed after she took some of her medication that evening, i.e., that her depression and anger multiplied. Finally, he gave his version of the altercation leading to his killing her:

> A. Well, I actually hear her. She's in the bathroom again. And normally she was in there kind of screaming and, you know, hashing out her issues and hitting the wall, but she's hitting it even harder now . . . . It really gets my attention.
>
> Q. Was she screaming at you?
>
> A. No, sir.
>
> Q. Just screaming, making a lot of noise?
>
> A. Yes, sir [and] I hear her hitting the walls abnormally hard.
>
> Q. All right. And at some point does she come out of the bathroom?
>
> A. Yes, she . . . comes out of the bathroom. I just about to stand up and go, you know, see what was the matter because she was hitting it, you now, harder than I ever heard her hit it before, and she comes into the kitchen and she sits on the washer and dryer.
>
> . . . .
>
> A. She sat on the dryer, and they're both across from each other. . . . . She started kind of sobbing and moaning. She wasn't exactly crying and — but she started kicking her feet, you know, back and forth, and she was kicking the washer and dryer very hard.
>
> . . . .
>
> Q. All right. What do you do when you hear this noise and see this activity?
>
> A. I stand up, and I walk over to her and I ask her, you know, what's — what's the matter? Can you tell me what's going on?
>
> . . . .

16

Q.     Did she do anything to you or take any physical action to you?

A.     She did. She kind of stared at me in a trance, like she was looking past me. And then she — I turned to walk away. And then as I was about to walk away because she wasn't answering me, she jumped off the washer and dryer and came toward me.

Q.     After she jumps off the washer and dryer, did you notice or sense that she jumped off the machine?

A.     Yes, sir. Yes, sir. I was spinning to walk away and I heard her jump off the washer and dryer and she ran up to me and gave me a big hug.

Q.     Did you turn back to her?

A.     Yes, sir.

Q.     All right. And what did Ms. Dossey do then?

A.     She ran up and gave me a big hug and a big kiss, and she was happy and she — and then immediately kind of looked down at my chest, and I just saw, you know, grief and depression fall over her face.

Q.     All right. After you see this, do you say anything to her at that moment?

A.     I'm — I'm speaking, I'm like what's the matter and she pivots, and she turns to walk back towards the washer and dryer.

Q.     Okay. Does she say anything to you?

. . . .

A Yes.

. . . .

Q.     What do you say?

. . . .

A.     I told her, let's — you know, let's look for your daughter, see if you can get your daughter on the phone.

. . . .

Q.     Did she ever actually make a connection and get ahold of [her daughter]?

17

A.    No, sir.

. . . .

Q.    All right. After she realized she wasn't going to get in touch, what did she do with the phone? What did she do?

A.    She — she put the phone on the counter. She started — she started to become aggressive, because I didn't want her to —

Q.    Describe — when you say she became aggressive, what did she do that makes you say that? What did you see?

A.    She became verbally aggressive towards me and had grabbed ahold of me.

Q.    How does she grab ahold of you?

A.    She put her arm on me, grabbed my shirt.

Q.    Okay. What did she do after she grabbed you by the shirt?

A.    She started pushing me. . . . . when I was turning out of the aisleway of the kitchen into the living room, she tried to push me as I was turning. Our feet tangled and we both fell into the wall and then rolled into the fish tanks. . . . . We fell into — there's an aisleway in between the — between the living room and the kitchen — and there's a little doorway and the closet, and as you see in the pictures, there's a fish tank right next to it. . . . She — when she was pushing me, our feet got tangled and I grabbed her arm not to fall, and we both fell. She fell basically headfirst into the doorway, and I fell and hit the side of my head and my shoulder. . . . . After we did that, I kind of rolled sideways, and I hit the fish tank and broke the fish tank. . . . . In response to that, I see that the water is leaking everywhere, so I run and grabbed a jug to start emptying the water, because the crack is at the bottom of the tank, and all the water is leaking off to the electronics, and I'm afraid it's going to start an electrical fire.

. . . .

Q.    All right. Do you, at some point, finish what the water? Are you through getting water out of your aquarium, the tank?

A.    Yes, sir. I didn't complete – completely finish emptying the water. . . . . As I making one of my trips back and forth between the tank, she punched me twice in the back of the head.

18

. . . .

Q.    What did you do in response to getting hit in the back of the head?

A.    I turned around and asked her, you know, why would you do that, what's going on, what's the matter?

Q.    Did she respond to that?

. . . .

A.    It was a physical response. It was immediate.

Q.    What did she do after you asked her what that was all about?

A.    She punched at me one more time. It was towards my face, and I leaned back and it hit me in the chest.

Q.    And do you do anything in response to this?

A.    As she swung, I caught her arm after it hit me in the chest, and I trapped that arm, and then bear-hugged her with my other arm and pulled her in close to me and told her to calm down and, you know, I asked her what's going on.

Q.    So when this bearhug — y'all are both — you're standing up at this time? . . . . Does she physically react to your bear hug?

A.    Yes, she does. . . . She bites at me. She bites at my hand and then she bites my finger. And then I start to loosen my grip on her.

Q.    All right. And does she say anything to you at this time?

A.    She — she still doesn't say anything to me. She's just — she's upset and she's kind — kind of halfway screaming. But I couldn't make out what she was saying entirely.

. . . .

Q.    All right. Does she do anything physically to respond to this?

A.    As I started to loosen my grip, she starts to push me. And she pushes me up against the wall that we just previously hit. . . . .We both run into the wall. She pushes me up against the wall, right in the corner, right — the corner of the wall hit me directly in my spine

where I had back surgery. And we both fall over sideways. We're stumbling sideways. And we run into basically the wall over there by the front door and knock over a bunch of items.

Q. What was knocked over when the two of you go towards the wall?

A. There was bunch of things by the wall. There was a rack full of tools and little items on it. A vacuum cleaner, a chair. I think like a little foot stool, ottoman, and a few other things, and a bicycle.

. . . .

Q. When y'all knock the stuff over, the tools and all, do y'all fall to the floor.

A. Yes, sir. . . . . I started to stand up, and she's doing the same.

. . . .

Q. After the two of you get up, what do you do?

A. I get up, and I fell kind of a little further away from her. And she fell right by the front door where everything fell.

Q. Do y'all get up together or does one get up before the other?

A. She gets up before me. . . . . She picks up a hammer that was knocked over.

. . . .

Q. And what do you do when you see this?

A. I get up — I get up slowly, and I basically ask her — my first reaction is to run out the door, because I see that she's angry.

. . . .

Q. What does she do with this hammer?

A. She starts swinging it over her head and cussing at me. . . . . I pick up the phone on the counter, and I tell her I'm going to call the police unless she puts it down.

. . . .

Q. All right. Which cell phone did you grab?

A. I grabbed her cell phone first that's on the counter. . . . .

20

I attempt to dial 911.

Q.    Are -- are you successful in that attempt to dial 911?

A.    No, sir, I was not. . . . . Because as I was starting to dial 911, she was approaching me with the hammer, swinging at my head.

Q.    All right. What did you do in response to that?

A.    I dropped the phone, and I ducked to my left, and the hammer grazed my head and hit me in the back shoulder, and I fell to my knees.

Q.    It hit you on your shoulder, in the back of your shoulder?

A.    Yes, sir. It hits me on the shoulder and I fall. And as she's approaching me, I fall into her legs and she falls down and drops the hammer.

Q.    And she falls where?

A.    She falls backwards as — because as I'm falling, I'm ducking. My momentum carries me forward into her and basically tackled her. And she falls backwards and I fall forward, and she drops the hammer.

Q.    Okay. Do you know at that moment where the cell phone is?

A.    I see it soon after, immediately, yes, sir.

Q.    Okay. And where was it?

A.    I was dialing with my right hand and it fell to the right of us.

. . . .

Q.    All right. Now, you're both on the floor; . . . . Where — where is her body located in relationship to your body?

A.    She is — I crawl on top of her, and she's head to toe. We're — we're laying head to toe right by the front door.

Q.    Okay. Do either one of you have anything in your hands at this moment as you recall?

A.    I picked up the cell phone. . . . . I started to try and dial the police again.

Q.    All right. What does [the complainant] do after you pick up the cell phone?

A.    She pulls out a knife on the side of her hip, and it catches my eye as I'm dialing the cell phone.

. . . .

Q.    After [the complainant] pulled out her Colt knife, what did you do?

. . . .

A.    I blocked — I grabbed her hand right before it hit me in the chest.

Q.    Describe how she was moving the knife?

A.    She was moving the knife, she had it in an overhand-type fashion, and she was moving it directly towards my chest, towards my heart.

Q.    Are you on top of her or how — what is y'all's relation to y'all's body when you see this?

A.    Yes, sir. She's — she's on her back, and I'm on my knees kind of straddled over her. And she's underneath thrusting the knife at my chest.

Q.    And you grab her right hand — what hand did you grab her hand in?

A.    I grabbed her hand with my right hand because the cell phone was in my left hand.

Q.    Okay. And after you grab it, what happens next?

A.    I stopped the 911 call. I grab it with my right hand. I'm barely able to stop it. So I drop the phone, and I grab her other arm -- or I grab her arm with my other hand. And I'm trying to wrestle the knife loose. And we kind of roll around, and she's throwing elbows and I'm throwing elbows. And I finally get the knife loose.

Q.    Are both of y'all on the floor when you describe this rolling around?

A.    Yes, sir.

Q.    Do you remember if y'all are still – are y'all hitting other objects, knocking more stuff over?

22

A. Yes, sir.

Q. All right. Do you have any way of remembering with accuracy how long this rolling around goes about — goes on?

A. No, sir. My head was hurting.

Q. At some point, do y'all stop rolling around?

A. Yes, sir.

Q. What happened to cause y'all to stop rolling around?

A. After I had shaken the knife loose out of her hand, I tossed it pretty far to the side. I'm able to climb back on top of her and I'm trying to hold her down and tell her to calm down.

. . . .

Q. Is she saying anything to you during this time — during this part of the struggle?

A. She's saying, mother f'er, get off me.

. . . .

Q. Is she screaming?

A. Yes, sir.

Q. Could you tell that she was angry?

A. Yes, I could.

Q. Were you scared at that moment?

A. I was terrified.

Q. Had you ever seen her act like that before?

A. No, sir.

Q. Had she ever come at you with a knife before?

A. No, sir.

. . . .

Q. So after you're on top of her, what — and you're trying — what else — are you trying to do anything else?

A. After I realized she wouldn't calm down, I started looking for my cell phone because I couldn't find the original one to dial 911 with?

23

Q.     Were you able to find your cell phone?

A.     Yes, sir.

Q.     And did you try and call 911 again?

A.     Yes, I did.

Q.     When you — do you get through to 911 this time?

A.     No, sir.

Q.     Why not?

A.     As I'm dialing again, she was rummaging through everything that was to the right of her tools and she hit me on the side of the head with a pair of pliers.

. . . .

Q.     After that, what do you do?

A.     As she hits me, I fall to the side on the tile. I'm dazed, confused, seeing stars really. Waiting. Waiting so I can regain my vision, trying to regain my composure.

Q.     All right. Are you excited and upset now?

A.     Yes, sir.

Q.     All right. What does Ms — so you're now on the tile; is that right?

A.     Yes, sir, I'm on my back.

Q.     And where's [the complainant] when you realize you're on your back on the tile?

A.     When — when I realized and able to see more clearly, I see her coming across the room and she has her knife in her hand, and she jumps on top of me.

Q.     Does she have the same knife, the one, the Colt knife?

A.     Yes, sir. Silver knife. . . . Physically, she jumps on top of me in the same fashion that I [am] straddling her. She straddles me and she's making an overhand thrusting motion right over to my head.

Q.     All right. And so now y'all have — have y'all swapped positions? You're on the floor, she's on top of you? . . . . And what do you see her doing with the knife?

24

A.    She's thrusting it towards my face.

. . . .

Q.    And what do you do when you see that?

A.    When I see that, I immediately move my head to the side and the knife travels to the side.

Q.    So the knife missed you, you were not hit by the knife?

A.    No, sir, it barely missed me.

Q.    After that, what do you do?

A.    After that, I go to grab her arm because she pulled her arm back, and she was making another thrusting motion towards my chest.

Q.    Are you able to grab her arm?

A.    Yes, sir. I stop it right before it hits my chest.

Q.    And what happens then?

A.    Then she starts putting her body weight.  She put her other hand over the top of the knife, and she's leaning — she's leaning into the knife, trying to thrust the knife into my chest.

Q.    What do you do in response to this?

A.    I prayed.

Q.    What do you physically do, Mr. Case?

A.    I grabbed — I grabbed — I grab her arms, and I'm realizing I'm not strong enough to stop her arm from continuing — continuing the motion of the knife to my chest.

Q.    All right.

A.    And then I pull out my knife —

Q.    How —

A.    — because I realize —

Q.    I'm sorry. How do you get your knife?

A.    My knife is on my right hip pocket.

Q.    Is it inside your pant's pocket?

A.    It's got a clip that's on the inside of my pant pocket.

Q.    So it's inside your pocket, but the clip is sticking out?

A.    Yes, sir.

Q.    Is that how you carry it?

A.    Yes, sir.

Q.    And are you able to open that knife?

A.    Yes, sir.

Q.    Are you able to pull the knife out of your pocket and open it one-handed?

A.    Yes, sir.

Q.    All right. After you open the knife, what do you do?

A.    I reach around and stab her in the back one time.

Q.    Okay. And why did you do that?

A.    I was trying to get her to drop her knife.

Q.    What was she doing with her knife when you stabbed her with your knife?

A.    She was — she was still leaning into the knife and she showed — she showed no emotion and no physical reaction to getting stabbed one time.

Q.    What was she physically doing with her knife, Mr. Case?

A.    She was physically thrusting it at my chest. She was leaning on the knife, laying in on my chest.

Q.     And is that when you stabbed her?

A.    Yes, sir.

Q.    How many times did you stab her?

A.    I stabbed her one time. Then I realized it wasn't having any affect on her.

Q.    All right. So after that, what do you do?

A.    I believe I stabbed again.

Q.    Okay. Did this time seem to have any affect on her?

A.    It did.

Q. What did she do after you stabbed her the second time?

26

A. She moved her arm to try and block my arm from stabbing her.

Q. Which arm did she move, her left or her right?

A. I believe it was her left arm.

Q. All right. And did — after she does that, do you respond to that movement? What happens next physically?

A. Yes, sir. Physically, she moves to block my arm, and she moves it out of the way, so I stabbed her in the side, the abdomen area, trying to still get her off of me.

Q. All right. After that, did she respond or react to that?

A. She — she weakened a little bit, and she loosened her grip. And we were rolling around, and I was finally able to role her off of me.

. . . .

Q. Tell us what part of the apartment all this takes place in.

A. By the front door of the apartment, by the tile. In the living room.

. . . .

Q. All right. After she moves to the side, she reacts to you stabbing her several times, what do you do physically?

A. Physically, I get her to loosen her grip, and then I kind of throw it and toss it to the side again, and I climb on top of her, and I'm looking for the cell phone to call 911.

Q. Are you saying anything to her?

A. I'm telling her to stop, to be still and calm down.

. . . .

Q. All right. Are you able to get a cell phone?

A. Yes, sir. . . . .it was my cell phone.

Q. All right. And do you call 911?

A. Yes, sir.

Q. Is this the call that does get through to 911?

A. Yes, it is.

27

. . . .

Q. All right. Is that the only time that day during all of this that you actually talked to someone at 911?

A. Yes, sir, I believe so.

Q. Okay. So when you called 911, how many times had you stabbed Ms. Dossey?

. . . .

A. Two to three times, sir.

Q. All right. Did you terminate the 911 call?

A. No, sir. . . . . She hit me again on the side of the head with the pliers. She hit the phone and the side of my head at the same time and knocked the phone out of my hands. . . . .After that, I fall to the side again. I'm laying on the tile. . . . .

Q. After [the complainant] hit you, what does she do then?

A. She starts trying to get up — . . . and reach for her knife that's to the side of her. . . . .

Q. What is your physical condition at this time?

A. My head is hurting. I'm seeing stars. Not able to see and hear completely straight.

Q And what do you do in response to seeing [the complainant] moving?

A. I try and hold her down as she's pushing her arm on top of me to lift herself up. . . . . She's trying to get up and she's pushing me down with her left — left arm, and I'm holding her down with my right arm. And I hear her rummaging around, trying to reach for the knife. And I kind of — I peer up, and I can see her hands only like an inch or two away from grasping the knife.

Q. What do you do when you see this?

A. When I see that, I knew I had no choice but to try and stop her from getting the knife again. . . . . I still had my knife to the side of me, and I had it, and I started swinging my knife over hand to the right. I still was unable to see clearly or hear clearly.

Q. Did you know at that time if you were striking [the complainant] with your knife?

28

A.    No, sir, I did not.

Q.    All right. Do you have any way of knowing how long this — or do you know how long this went on?

A.    No, sir I do not.

. . . .

Q.    And how do you realize the struggle is over?

A.    I realize the struggle was over when she stops fighting me and she stops — she stops grabbing at my —

Q.    Did she stop making noise or talking to you?

A.    Yes, sir, she stopped screaming at me and yelling at me.

Q.    And do you realize then that she was injured?

A.    Yes, sir, I do. . . . . . I immediately see that she has a wound to her neck, and I take my shirt off, and I start applying pressure to her neck.

Appellant testified that shortly thereafter the EMTs and police arrived. Appellant said that he told the police officers about the complainant's medications and how they affected her, and that she had been drinking that day. He said he also gave Sergeant Fisher his version of how the confrontation started and how the fight took place, but did not think Fisher believed him. He conceded that he told the police that he had only stabbed the complainant three or four times, but said it was because those were the only times he was sure about. When the police told him that in fact he had stabbed the complainant nineteen times, he did not believe them. Appellant testified that after about four hours of interviews at the police station, the officers informed him that he was being charged with murder.

Appellant also testified that he only stabbed the complainant because he "felt that I was fear for my life, and I needed to survive, and I did it in self-defense." He also expressed that he felt remorse about killing her.

On cross-examination, appellant stated that he did not believe the medical examiner's testimony that the complainant had been stabbed thirty times. He also acknowledged telling the police that he only visited the complainant occasionally at her apartment, despite the fact that he actually lived there. On cross-examination, appellant was also confronted with earlier statements that he had not continued to stab the complainant after he reached 911, which contradicted his trial testimony that all the fatal stabs were after the 911 calls. He also acknowledged that the complainant was much older than him and had two hip replacements, and that the early stabbings would have been painful, caused blood loss, and weakened the complainant, but maintained that he still believed she would overpower and kill him.

In response to questions about the medications that the complainant had allegedly taken the day she died, appellant testified that morning she took Vicodin, Soma, Bupropion, Prozac, Lunesta, Vyvanse, Clonopin or valium, and vitamins. He then testified that, later throughout the day, she took two Vyvanse, several Clonopin, Soma, and an antidepressant. He acknowledged that he did not direct the police to her medications when they arrived on the day she died, and that in an

earlier interview, he did not name all the same medications from his trial testimony. He also agreed that he was able to restrain the complainant for the 55-second 911 call in which the complainant can be heard begging to be let go in the background.

T. Felder, an associate professor of pharmaceutical sciences also testified as an expert in appellant's defense. He testified that he never met the complainant, but reviewed her Walgreens prescription records and her medical records from Integra Behavioral Health Care. He stated that there were sixteen prescribed medications on her Walgreen's records, but many were the same medications with different doses prescribed at different times: Bupropion (antidepressant), Clonazepam (anti-anxiety), Fluoxetine (anti-depressant), Vicodin (narcotic analgesic), Intuniv (ADHD treatment); Lunesta (sedative hypnotic); and Vyvanse (ADHD treatment). He testified to possible side-effects of each of these medications, including insomnia, anxiety, aggression, and hallucination. He also testified that most of these medications carry warnings to not mix with alcoholic beverages.

## C.  The Jury's Verdict and Trial Court's Judgment

The Jury was charged on the issues of murder and self-defense and found appellant guilty of murder. Punishment was also held to the jury. After finding against appellant on the special issue of "sudden passion arising from adequate

cause," the jury assessed punishment at 55 years' confinement. The court entered judgment on the jury's verdict, and appellant timely appealed.

## ISSUE ON APPEAL

In a single issue, appellant argues:

"The trial court erred by not admitting statements made by the complainant under the rule of optional completeness."

## APPLICABLE LAW

"The standard of review for a trial court's ruling under the Rules of Evidence is abuse of discretion." *Tovar v. State*, 221 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004)). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). "Hearsay statements are generally not admissible unless the statement falls within a recognized exception to the hearsay rule. *Id.* Rule 107, the rule of optional completeness, is one such rule." *Id.* Unless the erroneous exclusion of evidence rises to the level of constitutional error (i.e., "(1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or (2) a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense"), any error is only reversible if it affect

substantial rights, *id.* at 218–19, (*i.e.,* "had a substantial and injurious effect or influence on the jury's verdict." *Schultz v. State*, 457 S.W.3d 94, 99 (Tex. App.—Houston [1st Dist.] 2014, no. pet)).

> Under the rule of optional completeness,
>
> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. . . . .

TEX. R. EVID. 107. The purpose of the rule is to reduce the possibility of the jury's receiving a false impression from hearing only a part of some act, conversation, or writing. *Tovar*, 221 S.W.3d at 190 (citing *Credille v. State*, 925 S.W.2d 112, 116 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)). A party who opens a door to an issue "cannot complain when the opposing party desires to go into the details of that subject." *See Sherman v. State*, 20 S.W.3d 96, 101 (Tex. App.—Texarkana 2000, no pet.). "Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence." *Walters*, 247 S.W.3d at 217. "Further, the rule is not invoked by the mere reference to a document, statement, or act." *Id*. "And it is limited by Rule 403, which permits a trial judge to exclude otherwise relevant evidence if its unfair prejudicial effect or its likelihood of confusing the issues substantially outweighs its probative value." *Id*.

33

## ANALYSIS

The State introduced evidence of an earlier domestic disturbance call by the complainant one month before her murder. Sergeant Mills testified that she was assigned to follow up on the investigation, and that the complainant stated that she was not in pain at that time, did not show visible signs of injury, and did not want to pursue charges.

Outside the presence of the jury, the defense made an offer of proof about additional information appellant wanted to elicit from Mills about her interview with the complainant under the rule of optional completeness:

> Q. Can you tell us, for the record, out of the presence of the jury, what she said to you about what medication she was taking on the date of this incident?
>
> . . . .
>
> A. Yes, sir. She advised she was taking both depression medicine and sleep medicine prescribed.
>
> Q. Go on. What else did she say?
>
> A. She was saying and doing things that she didn't even remember.
>
> Q. Okay. So that was in the conversation that you have been testifying to, the one -- you only had one phone conversation with [the complainant]; is that correct?
>
> A. Yes, sir.
>
> Q. And that's the one you've been testifying to here in front of the jury today?
>
> A. Yes, sir.
>
> Q. And so you told us earlier in front of the jury about why she did not want to pursue charges in this matter?

34

A.    Yes, sir.

Q.    All right. But she also told you in that same conversation what you just testified to, that she explained that she was taking both depression medicine and sleep medicine, prescribed, and she was saying and doing things that she didn't even remember. She said that to you in that exact same one phone conversation y'all had?

A.    Yes, sir.

The court excluded this additional hearsay testimony. Appellant argues here that the jury was entitled to hear that the complainant said she was "taking both depression medicine and sleep medicine, prescribed, and that she was saying and doing things that she didn't even remember" because otherwise "the jury was left with the impression that the only reason the case was closed was that [the complainant] said she was not in pain at the time." Appellant additionally argues that, because his case was " predicated on his claim for self-defense and being able to provide a logical and/or reasonable explanation for [the complainant's] behavior for the pertinent time period before and during the struggle that led to her death" this "evidence would have clearly been more probative than prejudicial because it would have substantiated the defensive theory especially given the absence of any testing by the medical examiner's office for prescription drugs in [the complainant's] system."

The State responds that Mill's testimony that she investigated a potential assault on the complainant by appellant weeks before the murder did not open the

door to hearsay testimony that the complainant had memory problems related to her medication.

We conclude that, even assuming error in the trial court's not admitting the complainant's hearsay statement about her medication's effect on her memory from a domestic assault call a month before the murder, a review of the entire record reflects its exclusion was harmless. Substantial rights are not affected by the erroneous exclusion of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case." *Delapaz v. State*, 228 S.W.3d 183, 202 (Tex. App.—Dallas 2007, pet. ref'd) (citing *Motilla*, 78 S.W.3d at 355).

The trial court admitted, over the State's objection, Deputy Perez's testimony about his responding to the same earlier domestic assault incident. Perez was permitted to testify to appellant's hearsay statements to him claiming that he

36

had not hit the complainant and that they had been arguing about the complainant not timely taking her medications.

As the trial court noted, when Mills later testified that the State declined to pursue charges, Mills's comment that the complainant "advised she was not in pain at the time" was not solicited by the State's question—in fact, the State's attorney immediately told her to "stop" her answer. Nothing indicated that the complainant's comments to Mills about the effects of her medication on her memory contradicted or bolstered her claim that appellant had assaulted her on that prior occasion. And the State never later mentioned or emphasized Mills's statement that the complainant said she did not hurt anymore when she decided not to pursue charges.

Appellant's self-defense theory was that the complainant's medications made her act violent towards him, and that he was thus forced to kill her. Relevant to and in support of this theory, the jury heard Officer Blue's testimony that appellant said the complainant went "crazy this time," testimony about the multiple medications the complainant was taking, expert testimony about the effects those medications could have had on her behavior, and appellant's own version of how the medications impacted the complainant on the day of the murder such that he feared for his life.

Contradicting that theory, the jury heard evidence that the complainant was smaller and older than appellant, and physically disabled from hip surgeries. It heard evidence that appellant had no defensive wounds, but that the complainant had numerous defensive wounds. It also heard evidence that appellant claimed to have only stabbed the complainant 3 or 4 times in self-defense, but that he actually stabbed her at least thirty times all over her body.

In light of the totality of the evidence, we cannot say excluding the complainant's hearsay testimony about the impact of her medications on her memory a month before adversely affected the jury's decision in this case.

We overrule appellant's sole point of error.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).